# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>            Respondent,<br><br>      v.<br><br>JAMES DOUGLAS HARKCOM,<br><br>            Appellant. | No. 60628-3-II<br><br><br>UNPUBLISHED OPINION |

VELJACIC, C.J. — James Douglas Harkcom appeals his conviction for one count of vehicular homicide and one count of hit and run fatality. Harkcom raises several arguments on appeal. First, Harkcom, for the first time on appeal, argues that police violated his right to due process and counsel when they lied to his attorney to effectuate his arrest. Second, Harkcom argues that insufficient evidence supports his conviction because he was not a proximate cause of the victim's death. Third, Harkcom argues that the State engaged in prosecutorial misconduct during closing arguments by arguing facts not admitted into evidence and providing its personal opinion about Harkcom's level of intoxication on the night of the accident. And fourth, Harkcom argues that he received ineffective assistance of counsel because his attorney failed to suppress body camera footage that contained incriminating statements.

We conclude that: (1) Harkcom's unpreserved claim of alleged police misconduct does not amount to a manifest error affecting a constitutional right and we decline to review it for the first time on appeal; (2) sufficient evidence supports Harkcom's conviction; (3) the State did not engage

in prosecutorial misconduct; and (4) Harkcom's ineffective assistance of counsel claim fails because his attorney's decision to admit the body camera footage was a strategic decision, and Harkcom cannot demonstrate that he was prejudiced by any alleged error.

Accordingly, we affirm Harkcom's convictions.

FACTS

I.    BACKGROUND

On April 11, 2023, Harkcom went out to a few bars in Yelm to celebrate his birthday. Harkcom met up with Christa Gillespie, his ex-girlfriend, at Bob's Bar & Grill at around 8:20 p.m. The two played pool and "had a drink or two." Rep. of Proc. (May 30, 2024) (RP) at 403. Ashley Ray, the bartender working at Bob's Bar & Grill, later testified that Harkcom "probably [had] around four drinks." RP (May 30, 2024) at 436.

Bob's Bar & Grill began closing around 11:30 p.m., so Gillespie and Harkcom went across the street to the White Horse Tavern. While they were at the tavern, Gillespie and Harkcom each had one drink.

Gillespie and Harkcom stayed at the White Horse Tavern till about 1:15 a.m. Gillespie went back to her home in Lawrence Lake afterward. Gillespie later estimated that Harkcom had about three drinks. But Gillespie also explained she did not observe Harkcom exhibiting any signs of intoxication throughout the evening.

Harkcom proceeded to go to Walt's Place, a bar in McKenna that is about a "four-minute drive" from Bob's Bar & Grill. RP (May 30, 2024) at 447. There, Harkcom had about one and a half more drinks. Randi Williams, the bartender working at Walt's Place that evening, testified at trial that Harkcom was not exhibiting any signs of intoxication while he was there.

2

Video surveillance footage from Walt's Place showed Harkcom leaving the bar around 2:02 a.m., and he drove out of the parking lot at 2:06 a.m. Additional footage from a nearby gas station located on the corner of Bald Hills Road and Vail Road, showed Harkcom's vehicle[1] driving southbound on Bald Hills Road at 2:06 a.m.[2]

II.    THE ACCIDENT

Shortly after Harkcom drove by the gas station, Joel Derefield, a resident who lived on Bald Hills Road, was awoken to the sounds of "an engine revving and [a] scraping noise." RP (June 3, 2024) at 542. Derefield looked out his window and saw "flashing lights on the road." RP (June 3, 2024) at 544. Derefield "[g]ot dressed, grabbed a flashlight, [and] walked out to the end of [his] driveway."[3] RP (June 3, 2024) at 547.

It was a "wet and rainy" night. RP (June 4, 2024) at 713. The road was dark because there was no "street lighting around the area of the collision." RP (June 4, 2024) at 713. Upon going outside to the road, Derefield observed "a hulk of a vehicle . . . with the front end damaged." RP (June 3, 2024) at 550. The vehicle was later identified as the one Harkcom drove home from Walt's Place. Derefield called 911 and reported that there was an accident. The 911 call was placed at 2:16 a.m.

---

[1] Harkcom was driving a blue Volkswagen Golf.

[2] Former Thurston County Sheriff's detective Timothy English testified that either the time in the surveillance footage from Walt's Place or Four Corners "was off" when discussing the time discrepancy. RP (June 5, 2024) at 925. It was later established that the Four Corners video was accurate.

[3] It took Derefield approximately 7 to 10 minutes to get "get dressed and" go outside. RP (June 3, 2024) at 547.

Derefield stayed on the line and reported his observations to the 911 operator. Derefield noted that there was no one in the vehicle, nor was there anyone "standing in front of it[,] . . . to the side of it[,] or behind it." RP (June 3, 2024) at 550. Derefield observed that there was a motorcycle in the northbound lane, and "[t]here were pieces [of the motorcycle] all along the highway." RP (June 3, 2024) at 554. When Derefield walked toward the motorcycle, he saw a "body laying on the ground . . . [and] articles of clothing." RP (June 3, 2024) at 550. Derefield told the 911 operator "that the [person] was not breathing[,] . . . a part of [their] foot was missing[,] and there was no blood." RP (June 3, 2024) at 552.

Thurston County Sheriff's Deputy Matthew Kohlman, a collision technical investigator, was the first to arrive at the scene. Kohlman observed the road that the accident occurred on was "primarily a north-south road" with "[o]ne lane of travel for each direction . . . , separated by a painted double yellow solid line." RP (June 4, 2024) at 708-09. Kohlman also noted that the "[c]hips, grooves, and gouges"[4] were in "[t]he northbound lane . . . closer to the double yellow" line. RP (June 4, 2024) at 730-31. Kohlman also recognized that there was a "debris field"[5] that "was in the northbound lane going towards the east." RP (June 4, 2024) at 733-34.

Kohlman recorded that "the motorcycle rider was located [north] in relationship to the motorcycle." RP (June 4, 2024) at 742. Kohlman identified the rider as Elbi Santiago.

---

[4] Kohlman later explained at trial that "[c]hips, grooves, and gouges" are terms used to describe "roadway evidence caused by a collision. These occur when the vehicles meet and there's an energy transfer. That energy goes down towards the road, causing metal from the vehicles to dig into the road." RP (June 4, 2024) at 730.

[5] Kohlman also explained that the term "debris field" is "used to describe kind of a cone shape that debris that's flung from a vehicle during a collision will make." RP (June 4, 2024) at 733. "[D]epending on the angle of the collision, there's going to be pieces of car flung. It . . . start[s] at the point of collision and spread[s] out. . . . [I]t generally spreads out in kind of a 'V' . . . cone shape." RP (June 4, 2024) at 734.

4

Harkcom's vehicle was "in the southbound lane on the west side." RP (June 3, 2024) at 748. The damage was on "[t]he front left" portion of the vehicle. RP (June 3, 2024) at 749. "[M]etal was displaced and mangled . . . around the front rear wheel[,] . . . the hood . . . was pushed back to the right[,] and the front windshield was shattered." RP (June 4, 2024) at 749.

Kohlman later testified that "the point of maximum engagement,"[6] was in the northbound lane. RP (June 4, 2024) at 734. Kohlman discussed how there were a "set of [skid] marks"[7] in the southbound lane at a "curved portion of the road." RP (June 4, 2024) at 719. The skid marks were going "[d]iagonally towards the northbound lane[,] . . . [but they were] still going . . . in a southern direction." RP (June 4, 2024) at 718. The skid marks did not "cross into the northbound lane." RP (June 4, 2024) at 720. Although the speed limit was 50 miles per hour on the Bald Hills Road, Kohlman calculated that Harkcom's vehicle was going "between 54 and 64 miles an hour with the average being 59."[8] RP (June 4, 2024) at 785. Kohlman also calculated that Harkcom's vehicle was going 38 to 45 miles per hour at the time of the impact.

---

[6] Kohlman explained that there are three stages of an accident: "Initial contact, maximum engagement, and separation." RP (June 4, 2024) at 731. "Initial contact" is the "moment in time where the vehicles first connect." RP (June 4, 2024) at 731. "[M]aximum engagement is the . . . brief moment in time . . . where the forces from Vehicle A and Vehicle B are acting upon each other at the greatest they can." RP (June 4, 2024) at 732. And "separation" is the point that "immediately follows maximum engagement . . . where all the energy ha[s] been transferred and the vehicles begin to separate." RP (June 4, 2024) at 732.

[7] Skid marks, also known as "tire friction marks," are "marks left by tires when they are locked and sliding across the roadway and [create] friction." RP (June 4, 2024) at 714. The friction "creates heat . . . and causes oil in the roadway to rise to the surface leaving skid marks." RP (June 4, 2024) at 714.

[8] Kohlman calculated the vehicle's speed "using the initial velocity formula" and the length of the skid marks. RP (June 4, 2024) at 784. In calculating the speed of the vehicle, Kohlman "gav[e] the benefit of the doubt to the driver" because he omitted any "speed loss from the collision." RP (June 4, 2024) at 787. Based on Kohlman's training and experience, there would likely have been some speed loss from the collision, meaning that the vehicle could have been going faster than Kohlman's estimate.

The evidence suggested that Santiago did not respond before the collision, meaning that he did not attempt to avoid the accident. Kohlman acknowledged that he could not know "where the motorcycle was before the point of impact" because of a lack of roadway evidence from the motorcycle. RP (June 4, 2024) at 839. But Santiago's injuries supported that the collision "occurred on his left." RP (June 4, 2024) at 815. And Kohlman confirmed at trial that there would have been "[m]ore [damage to the] front end or passenger's side" portions of Harkcom's vehicle "if [Santiago] was traveling northbound in the southbound lane." RP (June 4, 2024) at 828-29.

III.   THE INVESTIGATION

At 10:08 a.m., Harkcom "called 911 and reported that his vehicle had been stolen." 2 RP at 611. Harkcom explained "that a friend of his had messaged him saying that his vehicle was on the Thurston County scanner page as being involved" in the collision that took place earlier that morning. RP (June 3, 2024) at 611.

Detective Timothy English, along with three other officers, went to Harkcom's residence around 2:00 p.m. to follow-up on Harkcom's call. All officers were armed and in uniform. The encounter was documented on English's body camera.

Harkcom was in his garage working on a vehicle. Harkcom explained that he went out around 9:00 p.m. and he played pool and threw some darts. Harkcom did not know when he got back home. English asked if Harkcom had been drinking. Harkcom was hesitant to answer, commenting that he was not sure if he should even be talking to the officers considering the fact that his vehicle was involved in a fatal accident. English responded that it was "entirely [Harkcom's] call." Ex. 323, at 3 min., 34 sec.

English proceeded to ask if Harkcom had any injuries. Harkcom confirmed that he did not. English remarked that he "[could not] see a scratch" on Harkcom. Ex. 323, at 3 min., 47 sec. to 3 min., 52 sec. English later testified at trial that he had briefly seen Harkcom's vehicle prior to talking with him, so he was aware of the extent of the damage. In light of this, English testified that a person would typically "have substantial injuries from an impact." RP (June 4, 2024) at 899. English did, however, acknowledge that it was possible that a person could not be injured in such an accident.

Harkcom explicitly denied driving his car at the time of the accident. Throughout the encounter, Harkcom continued to express his reluctance to speak with English and the other officers. Harkcom also expressed concern about there being four officers at his residence. English explained that it was necessary to have four officers in the event Harkcom was the driver because he owned a lot of firearms and they did not know his mental state.

The officers assured Harkcom that they were solely concerned about his whereabouts the night prior and were not focused on whether he was drinking. English also explained that there was blood on the airbag in Harkcom's vehicle that would be used to positively identify the driver. English commented that if Harkcom was not the driver, then he had no fear of talking with them. But English also told Harkcom that if he was the driver, he would recommend getting an attorney. Harkcom replied that he knew people who worked in law enforcement, and he said that he should not even be talking with English and the other officers. One of the officers responded saying that not providing a statement would make Harkcom a suspect.

Harkcom's encounter with the officers lasted over 30 minutes. The officers did not advise Harkcom of his *Miranda*[9] rights. Harkcom retained counsel the next day.

IV.    HARKCOM'S ARREST

On April 14, English contacted Harkcom's attorney, explaining they had a warrant to get a sample of Harkcom's DNA (deoxyribonucleic acid). English wanted Harkcom's attorney to tell Harkcom to "respond to the Yelm Police Department" and "'to come . . . to the station to provide a buccal swab.'" RP (May 29, 2024) at 41; RP (June 3, 2024) at 593. English also told Harkcom's attorney that they would "'release [Harkcom] right back to [him].'" RP (May 29, 2024) at 41. This was untrue. English "did not have a warrant signed for buccal swabs until after [Harkcom's] arrest."[10] RP (June 5, 2024) at 876.

Harkcom "immediately did what [his attorney] asked . . . [and] attempted to drive to [the] Yelm Police Department." RP (June 3, 2024) at 593. But the police were "outside of [Harkcom's] residence," waiting for him. RP (June 3, 2024) at 593. Harkcom was "arrested . . . as soon as he got off the property." RP (June 3, 2024) at 592. English called Harkcom's attorney afterward to apologize for lying to him. It was later explained that officers employed this tactic because of their "concerns about the large number of firearms in [Harkcom's] house." RP (June 3, 2024) at 591.

Harkcom was charged with one count of vehicular homicide and one count of hit and run fatality. The charge for vehicular homicide consisted of three alternatives, alleging that Harkcom "operate[d] a motor while under the influence of intoxicating liquor or any drug, . . . operate[d] a

---

[9] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[10] It is not entirely clear when English obtained a search warrant for the buccal swab. According to Harkcom's attorney, the officers did not obtain a warrant until after Harkcom was arrested. A generous reading of English's testimony might support that the warrant was obtained before Harkcom's arrest and was executed on the same day that he was arrested. But if English had obtained a warrant for a buccal swab, there was no reason for him to apologize to Harkcom's attorney for lying.

motor vehicle in a reckless manner, or . . . operate[d] a motor vehicle with disregard for the safety of others." Clerk's Papers (CP) at 4.

V.     HARKCOM'S TRIAL

A.     Pretrial Proceedings

When addressing the parties' motions in limine, the State did not contest Harkcom's motion that sought to "exclude opinion or interpret[ation of] the video evidence recovered during the course of the investigation." CP at 19. The motion explicitly addressed not allowing detectives to testify that video surveillance footage showed a bartender giving Harkcom a "long pour." CP at 19.

The trial court also brought up the admissibility of English's body camera footage. Initially, defense counsel filed a motion in limine to exclude portions of the footage. The State explained that the parties had come to an "agreement to allow the . . . entire [video] to be admitted, assuming [a] proper foundation [would] be laid." RP (May 29, 2024) at 47.

In response, Harkcom's attorney said,

> I think I should make a record because [the video] implicates some of . . . Harkcom's constitutional rights.
>     So as the Court knows from my motions in limine, I think there were portions that the Court could exclude and portions that the Court would necessarily have to exclude. That would require redactions to the body cam itself that would become apparent to the jury, in my opinion, that things were removed from the body cam footage. I have explained to my client he has a right to object to his—I wouldn't say it was an invocation of right to counsel. He provided the name of the attorney, they attempted to contact the attorney, and then my client said, "Once I confirm with my attorney that I should make a statement, I'll make a statement." And I've explained to him the Court would probably exclude that. And the issue with excluding it is it's going to remove other information on there and not provide much of a context. My client prefers the entire context as opposed to the redactions.
>     So [the State] is correct, after speaking to Mr. Harkcom, we're, I guess, withdrawing my motion in limine . . . and agreeing to the admissibility of the entirety of [the video] for the reasons I stated. And Mr. Harkcom understands that. We discussed it at length, and that's how he wants to proceed.

RP (May 29, 2024) at 47-48. In line with this exchange, Harkcom's attorney did not object to the admission of the body camera footage at trial.

B.     Evidence Presented at Trial

At trial, it was established that the blood on the driver's airbag matched Harkcom's DNA. "It [was] 9.6 octillion times more likely to observe [the DNA profile obtained from the blood on the airbag] if it originated from Mr. Harkcom rather than an unrelated individual selected at random from the U.S. population." RP (June 12, 2024) at 1240.

With respect to Santiago's cause of death, Dr. Megan Quinn, a forensic pathologist, explained that Santiago suffered from "atlantooccipital dissociation," also known as "internal decapitation" as a result of the accident. RP (June 12, 2024) at 1151. Dr. Quinn testified that Santiago's injuries suggested that "the left side of his body impacted something with tremendous force." RP (June 12, 2024) at 1154.

Dr. Quinn further testified that "Santiago had methamphetamine in his system" at the time of the accident. RP (June 12, 2024) at 1155. Specifically, Santiago had "710 nanograms per milliliter" of methamphetamine in his system. RP (June 12, 2024) at 1117. Dr. Quinn noted that the injuries Santiago sustained "would have been fatal with or without the presence of methamphetamine in his system." RP (June 12, 2024) at 1156.

Naziha Nuwayhid, Ph.D., a forensic toxicologist with the Washington State Toxicology Laboratory, acknowledged that "methamphetamine is a stimulant" that, among other things, "increases . . . self-confidence of the person" using the substance. RP (June 6, 2024) at 1115. Dr. Nuwayhid explained that individuals with "blood levels of 200 to 600 nanograms per milliliter [of methamphetamine] have been reported . . . [to] exhibit violent and irrational behavior." RP (June 6, 2024) at 1117. Dr. Nuwayhid also testified that "high doses of methamphetamine [could] also

elicit restlessness, confusion, hallucinations, circulatory collapse, and convulsions." RP (June 6, 2024) at 1117. And Nuwayhid acknowledged that "the effects of methamphetamine . . . vary significantly from person to person." RP (June 6, 2024) at 1116.

      C.      Jury Instructions and Closing Arguments

Prior to closing arguments, the jury was specifically instructed by the trial court that:

> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

RP (June 13, 2024) at 1297; CP at 107.

During the State's rebuttal, the prosecutor said:

> You have ample photos that [were] admitted into evidence. And I submit to you, look at those photos closely because those photos tell you a lot. You will see in the photos that in the driver's seat, the driver's seatbelt is somewhat loose and dangling in the actual seat. You will see from the photos that no other seat belt in that car was dangling. . . . [W]hy is that important? That is important because common sense and experience tells us that when a collision occurs and you are wearing a seat belt, that seat belt is going to lock and when it locks in place. Even when you unbuckle the seat belt, it doesn't retract. The only seat belt that did not—that was not retracted from the car was the driver's seat belt. All the other seat belts were retracted.
>
> And why is that significant? I submit to you that is significant because that shows no one else was in the car when the collision occurred.
>
> What else is important is if you look at the photographs of—from the car, you will see, as [defense counsel] is suggesting, that Mr. Harkcom was in the front passenger's seat. That's also not plausible because there is stuff on the front passenger's seat. There is stuff in the middle of the seat. And I submit to you, ladies and gentlemen of the jury, when you are sitting down, you are not going to be sitting on stuff. You want to be sitting in a seat that is empty. But there is stuff in the passenger's seat, so that suggests to you that no one was actually sitting in the passenger's seat.

RP (June 13, 2024) at 1383-84.

The State also commented:

> So let's, again, talk about some of the evidence we have. One of the surveillance footages from Walt's is again, it is the—it's Channel 6 and it is the camera pointing to the parking lot. And ladies and gentlemen of the jury, I submit to you when you go back and you deliberate, watch that surveillance footage carefully. Watch how Mr. Harkcom walks as he exits his car and is walking into Walt's. And I submit to you, when you watch that, you will see that Mr. Harkcom is not walking in a straight line. In fact, you can tell that his balance is not 100 percent there because he's sort of walking wobbly. And he is also walking, I submit to you, with a heavy foot.
>
> And why is that significant? That's significant because that shows that he is already under the influence of alcohol, that all the alcohol he consumed earlier that night prior to getting to Walt's is already affecting him on something as simple as simply walking and that is significant because after he got to Walt's he didn't stop drinking. He continued to drink and he consumed two more drinks.

RP (June 13, 2024) at 1340-41.

Finally, the State remarked:

> You will see in the surveillance footage from Walt's that Randi Williams, when she's pouring the second drink for Mr. Harkcom, it is not a single shot, I submit to you. Because you will see in the surveillance footage, she's pouring the whiskey, and then she runs out of the whiskey, and then she goes back and then she gets more whiskey and she continues pouring.

RP (June 13, 2024) at 1391. Defense counsel did not object to any of these statements.

D.      Harkcom's Verdict and Sentence

The jury found Harkcom guilty of one count of vehicular homicide and one count of hit and run fatality. The jury was not unanimous for a special verdict on whether Harkcom was "operating the motor vehicle while under the influence of intoxicating liquor or drugs," or whether Harkcom was "operating the vehicle in a reckless manner." CP at 129. The jury unanimously concluded that Harkcom was "operating the motor vehicle with disregard for the safety of others." CP at 129.

Harkcom was sentenced to 45 months of confinement and 12 months of community custody.

Harkcom appeals.

ANALYSIS

I.    GOVERNMENT MISCONDUCT

For the first time on appeal, Harkcom argues the events leading up to his arrest amounted to outrageous government conduct that violated his right to due process and interfered with his right to counsel.  And because the officers' conduct was "so shocking as to render the proceedings unfair," Harkcom urges this court to reverse and dismiss his convictions with prejudice.  Br. of Appellant at 16 (emphasis omitted).  The State argues that the record is insufficient to review this issue for the first time on appeal under RAP 2.5(a)(3).[11]  Nevertheless, the State asserts that the officers' actions did not constitute misconduct, nor did they violate Harkcom's right to counsel. We conclude that Harkcom does not succeed in showing that his claim implicates a manifest error affecting a constitutional right under RAP 2.5(a)(3) and decline to review his unpreserved claim.

A.    RAP 2.5(a)

Courts do not consider issues raised for the first time on appeal.  *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); RAP 2.5(a).  An issue, however, may be raised for the first time on appeal if there is (1) a "lack of trial court jurisdiction," (2) a "failure to establish facts upon which relief can be granted," or (3) a "manifest error affecting a constitutional right."  RAP 2.5(a); *McFarland*, 127 Wn.2d at 332-33.

Critically, RAP 2.5(a)(3) "is not intended to afford criminal defendants a means for obtaining new trials whenever they can 'identify a constitutional issue not litigated below.'"  *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1988) (quoting *State v. Valladares*, 31 Wn. App. 63,

---

[11] Harkcom did not move to dismiss the charges against him based on the alleged misconduct under CrR 8.3(b).

76, 639 P.2d 813 (1982), *aff'd in part, rev'd in part by State v. Valladrares*, 99 Wn.2d 663, 664 P.2d 508 (1983)). Instead, the exception "encompasses developing case law while ensuring only certain constitutional questions can be raised for the first time on review." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). And even when a defendant satisfies RAP 2.5(a)(3), the error is still subject to review under the constitutional harmless error standard. *Scott*, 110 Wn.2d at 687 (explaining that RAP 2.5(a)(3) "does not help a defendant when the asserted constitutional error is harmless beyond a reasonable doubt").

To satisfy RAP 2.5(a)(3) "and raise an error for the first time on appeal, [a defendant] must" first demonstrate that "the error is truly of constitutional dimension." *O'Hara*, 167 Wn.2d at 98. Then, a defendant must prove that the error was manifest. *Id.* Stated differently, "[t]he defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial." *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). If a party raising an argument for the first time on appeal fails to satisfy the exception articulated in RAP 2.5(a)(3), we may decline to review the issue.

Courts "do not assume the alleged error is of constitutional magnitude;" instead, "[w]e look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." *O'Hara*, 167 Wn.2d at 98.

"'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." *Kirkman*, 159 Wn.2d at 935. Actual prejudice requires a "'plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (internal quotation marks omitted) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

B.      Harkcom's Right to Due Process

"[T]he conduct of law enforcement . . . may be 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *State v. Lively*, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996) (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)); U.S. CONST. amend XIV.  "Dismissal is appropriate only in the most egregious of cases" that "shock the universal sense of fairness."  *State v. Athan*, 160 Wn.2d 354, 377, 158 P.3d 27 (2007); *Lively*, 130 Wn.2d at 19.

Whether the State engaged in outrageous conduct violating due process is evaluated based on the "'totality of the circumstances.'"  *Lively*, 130 Wn.2d at 21 (quoting *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981)).  Each claim must be resolved on its unique set of facts after evaluating each component of the government's conduct.  *Lively*, 130 Wn.2d at 21  The court's focus must be on the State's conduct, not the defendant's predisposition, and the court must keep in mind "'proper law enforcement objectives—the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness.'"  *Id.* at 21-22 (quoting *People v. Isaacson*, 44 N.Y.2d 511, 378 N.E.2d 78 (1978)).

Here, Harkcom failed to move to dismiss the charges against him under CrR 8.3(b) based on the alleged misconduct.  Therefore, Harkcom's claim is unpreserved, and we can decline review of it unless the alleged error is a "manifest error affecting a constitutional right."  RAP 2.5(a)(3).

Harkcom's claim does implicate a constitutional right, *Lively*, 130 Wn.2d 19, but he cannot demonstrate that there was a manifest error.[12]

The alleged misconduct does not amount to a manifest error because there is no evidence in the record showing actual prejudice. Critically, the record is devoid of any suggestion that the ruse undermined Harkcom's right to due process. As explained by the State, "Harkcom appeared at over nine pretrial hearings . . . while being represented by [his attorney], or an attorney from his firm." Br. of Resp't at 28. "At no point . . . did Harkcom express a lack of distrust or confidence in his attorney." Br. of Resp't at 28-29. Harkcom points to the fact that he objected to a continuance at a pretrial proceeding to prove otherwise.[13] We conclude that this is insufficient to support that the officers' conduct resulted in the alleged error being manifest.

Therefore, we conclude that Harkcom failed to demonstrate that the alleged misconduct constituted a manifest error affecting a constitutional right and decline to review his unpreserved claim for the first time on appeal.

---

[12] In Harkcom's opening brief, he appears to suggest that claims of government misconduct are *automatically* reviewable for the first time on appeal under RAP 2.5(a)(3). *Lively*, 130 Wn.2d at 19. This is incorrect. Defendants seeking review of alleged police misconduct must still demonstrate that their claim implicates a manifest error affecting a constitutional right to be reviewed for the first time on appeal. *See State v. Valentine*, 132 Wn.2d 1, 22-25, 935 P.2d 1294 (1997) (declining to address a defendant's claim of government misconduct for the first time on appeal because the alleged error was not manifest).

[13] Harkcom's attorney was in another trial, and Harkcom expressed frustration at the lack or discovery and the pace of the case.

C.      Harkcom's Right to Counsel

A criminal defendant has a right to counsel under the Sixth Amendment to the United States Constitution and article 1, § 22 of the Washington State Constitution. *State v. Cory*, 62 Wn.2d 371, 373, 382 P.2d 1019 (1963). A defendant's right to counsel "includes the right to confer privately with his or her attorney." *State v. Fuentes*, 179 Wn.2d 808, 818, 318 P.3d 257 (2014).

"If a state actor has violated the defendant's Sixth Amendment right, prejudice to the defendant is presumed." *State v. Couch*, 29 Wn. App. 2d 660, 667, 541 P.3d 1043, *review denied* 3 Wn.2d 1010 (2024). Consequently, the State must "show beyond a reasonable doubt that the defendant was not prejudiced." *Fuentes*, 179 Wn.2d at 819-20.

Here, Harkcom similarly failed to move to dismiss the charges against him based on the alleged police misconduct pursuant to CrR 8.3(d). Consequently, Harkcom's claim is unpreserved, and we can deny review unless Harkcom succeeds in showing his claim implicates a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Again, Harkcom demonstrates that his claim implicates a constitutional right, *Couch*, 29 Wn. App. 2d at 667, but he fails to prove that the alleged error was manifest.

As explained above, Harkcom's claim does not amount to a manifest error because there is no evidence of actual prejudice. Even though we presume prejudice when a state actor violates a defendant's right to counsel, the burden is on Harkcom to prove that there was actual prejudice under RAP 2.5(a)(3), which requires a "'plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.'" *Kirkman*, 159 Wn.2d at 935 (internal quotation marks omitted) (quoting *WWJ Corp.*, 138 Wn.2d at 603). There is simply no evidence in Harkcom's case to meet this standard.

Harkcom argues that his "failure to seek a change in counsel is not dispositive of this issue." Reply Br. at 10. And Harkcom explains that "[a] person who has hired an attorney to represent them cannot always afford to hire a new one on the spot, should an issue of distrust arise." Reply Br. at 10-11. Moreover, Harkcom comments that "a person may not want to bring up a loss of trust with their attorney or the court[] for fear that this may exacerbate the issue and damage the relationship further." Reply Br. at 11. While we are sensitive to the dynamics present in the attorney-client relationship, we must insist that there be some record of interference with the relationship, especially when such a claim is being raised for the first time on appeal. Otherwise, we would be left to speculate, which we decline to do.

We conclude that Harkcom failed to demonstrate that his unpreserved claim implicated a manifest error affecting a constitutional right and decline to review it for the first time on appeal.[14]

## II. SUFFICIENCY OF THE EVIDENCE

Harkcom argues that sufficient evidence does not support his conviction for vehicular homicide because "the State failed to prove that . . . Harkcom was [a] proximate cause of the collision resulting in . . . Santiago's death."[15] Br. of Appellant at 29. The State argues that there was sufficient evidence to support Harkcom's conviction. We agree with the State.

---

[14] It bears mentioning that had there been an objection before the trial court, it is likely that evidence would have been developed on the record regarding the actual police conduct and any impact on Harkcom's right to a fair trial and a right to counsel. But the lack of evidence forecloses Harkcom's governmental misconduct claim because we cannot be sure what occurred on this record. Because of the limited record, we are reticent to comment on the propriety of the police conduct alleged and the impact said conduct had on Harkcom's trial.

[15] Harkcom does not challenge any other element for his conviction on appeal.

To satisfy due process, the State must prove every element of the crimes charged beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 502, 120 P.3d 559 (2005). The test for determining the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found [the defendant] guilt[y] beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Under a sufficiency challenge, our review is "highly deferential to the jury's decision" because "questions of credibility, persuasiveness, and conflicting testimony must be left to the jury." *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014); *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). A defendant challenging the sufficiency of the evidence admits "the truth of the State's evidence and accepts the reasonable inferences to be made from it." *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Therefore, we must draw "all reasonable inferences from the evidence in favor of the State and against the defendant." *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024).

When we evaluate the sufficiency of the evidence supporting a conviction, we consider circumstantial evidence to be as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980); *see also O'Neal*, 159 Wn.2d at 506 ("Direct evidence is not required to uphold a jury's verdict; circumstantial evidence can be sufficient."). "[E]ven if the only evidence of guilt is circumstantial, the jury need only be convinced of guilt beyond a reasonable doubt." *State v. Couch*, 44 Wn. App. 26, 30, 720 P.2d 1387 (1986).

Under RCW 46.61.520(1), a driver commits vehicular homicide if a person dies "within three years as a proximate result of an injury proximately caused by" a driver who operated a motor vehicle: (a) while under the influence of intoxicating liquor or any drug as defined in RCW 46.61.502; or (b) in a reckless manner; or (c) with disregard for the safety of others. Here, the jury

convicted Harkcom under the third alternative: operating a motor vehicle with disregard for the safety of others.

"[A] defendant's conduct is a 'proximate cause' of harm to another if, in direct sequence, unbroken by any new independent cause, it produces the harm, and without it the harm would not have happened." *State v. Meekins*, 125 Wn. App. 390, 396, 105 P.3d 420 (2005); 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 90.07, at 276 (4th ed. 2016). "A defendant's conduct is not a proximate cause if some other cause was the sole cause." *Meekins*, 125 Wn. App. at 397.[16]

Here, when viewing the evidence in the light most favorable to the State, sufficient evidence supports that Harkcom was a proximate cause of Santiago's death. Several pieces of evidence admitted at trial support this conclusion.

First, Kohlman testified that "the point of maximum engagement" was in the northbound lane. RP (June 4, 2024) at 734. Second, Kohlman testified that he observed "chips, grooves, [and] gouges" in "[t]he northbound lane . . . closer to the double yellow" line, supporting that the accident occurred in the northbound lane. RP (June 4, 2024) at 730-31. As Kohlman explained at trial, "[c]hips, grooves, [and] gouges . . . occur when . . . vehicles meet and there's an energy transfer[, and t]hat energy goes down towards the road, causing metal from the vehicles to dig into the road." RP (June 4, 2024) at 730. Because the chips, grooves, and gouges were in the northbound lane, this evidence supports that the accident occurred in the northbound lane, meaning that Harkcom crossed the double yellow line and hit Santiago. If Santiago had crossed over into the southbound

---

[16] Harkcom relies on *Meekins* to apparently argue that the court's instructions on proximate cause prevented the jury from considering the sole cause of the accident, which he believes was Santiago. We disagree with Harkcom's reliance on *Meekins* because the evidence supports that Harkcom was a proximate cause of the accident.

lane, there would have been chips, grooves, and gouges in that lane, but Kohlman found none. Third, Kohlman also found that the "debris field was in the northbound lane going towards the east." RP (June 4, 2024) at 734. And fourth, Kohlman explained that there would have been more damage to the "front end or passenger's side" of Harkcom's vehicle "if [Santiago] was traveling northbound in the southbound lane." RP (June 4, 2024) at 828-29.

Harkcom relies on several facts that suggest he was not a proximate cause of Santiago's death. For example, Harkcom notes that Santiago never engaged the motorcycle's brakes. Harkcom also highlights Kohlman acknowledged that Santiago "may have been driving in the wrong lane prior to the crash."[17] Br. of Appellant at 33 And Harkcom points to Santiago being high on methamphetamine at the time of the collision. The jury considered this conflicting evidence and ultimately concluded that Harkcom was a proximate cause of Santiago's death. We do not reweigh conflicting evidence, and it is not our role to second-guess the jury's decision on conflicting testimony. *Davis*, 182 Wn.2d at 227.

Therefore, when viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found Harkcom guilty of vehicular homicide beyond a reasonable doubt, and sufficient evidence supports his conviction.

---

[17] Although nuanced, Harkcom misrepresents Kohlman's testimony. The exchange is as follows:

> [Q.] . . . You can't tell the jury anything about where the motorcycle was before the point of impact, can you?
> [A.] No.
> [Q.] So the point of impact is the only information about the relation of the motorcycle to the vehicle that you can provide this jury, right?
> A. Correct. It's the only roadway evidence that I have.

RP (June 4, 2024) at 839.

III.    PROSECUTORIAL MISCONDUCT

Harkcom argues that the State engaged in prosecutorial misconduct during closing argument because it argued facts not in evidence and gave its "personal opinion that . . . Harkcom was intoxicated." Br. of Appellant at 37. The State argues that the prosecutor did not engage in misconduct, but even if it did, Harkcom cannot demonstrate prejudice. We agree with the State.

A criminal defendant has a constitutional right to a fair trial. WASH. CONST. art. I, § 22; U.S. CONST. amend. VI, XIV. As quasi-judicial officers, prosecutors "have a duty to ensure that defendants receive a fair trial." *State v. Fuller*, 169 Wn. App. 797, 812, 282 P.3d 126 (2012). Consequently, prosecutorial misconduct may deprive a defendant of this right. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012).

When a defendant demonstrates a prosecutor's conduct was improper, but they failed to object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). This standard of review requires the defendant to show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

"Defense counsel's decision not to object or request a curative instruction 'strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.'" *State v. Gauthier*, 189 Wn. App. 30, 38-39, 354 P.3d 900 (2015) (quoting *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

We review the prosecutor's conduct in the context of the entire case. *Thorgerson*, 172 Wn.2d at 443. And we presume that the jury follows the court's instructions. *State v. Stein*, 144 Wn.2d 236, 247, 27 P.3d 184 (2001). Prosecutors have "wide latitude to argue reasonable inferences from the evidence," but they must "'seek convictions based only on probative evidence and sound reason.'" *Glasmann*, 175 Wn.2d at 704 (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)).

Here, Harkcom did not object to any of the prosecutor's statements during closing argument. As a result, any alleged error is waived unless Harkcom demonstrates that "the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. Harkcom fails to make this showing.

A.      Comments About Seat Belts and Locking Mechanisms

When reviewing the prosecutor's comments about the locking mechanism of seat belts in the context of the entire case, it is evident that these remarks were a reasonable inference drawn from the evidence admitted at trial. There were several exhibits admitted at trial depicting the seat belts of Harkcom's vehicle.[18] And we agree with the State "the mechanisms of seat belts is not beyond the common understanding of an ordinary person." Br. of Resp't at 40. Harkcom's argument suggesting otherwise is without merit.

B.      Comments About Harkcom's Drinking and Signs of Intoxication

Assuming without deciding that the prosecutor's remarks on either issue were improper, Harkcom cannot establish that he was prejudiced. The jury did not convict Harkcom of vehicular

---

[18] Harkcom argues that "the photographs of the vehicle do not adequately depict the passenger-side seatbelt and are not sufficient to determine whether that seatbelt was also loose." Reply Br. at 19. The jury evaluated this evidence and ultimately found Harkcom was the driver. It is not our role to disturb a jury's determination of the evidence on appeal. *Davis*, 182 Wn.2d at 227.

homicide based on the alternative that he was operating his vehicle while under the influence. Harkcom claims that "the prosecutor's improper and unsupported arguments likely played a role" in the jury's determination that Harkcom was "driving with a disregard for the safety of others." Reply Br. at 23. We disagree because the jury could view the video for themselves and make a determination on whether Harkcom demonstrated signs of intoxication. But also, there was significant evidence of guilt that would override any concerns about prejudice from the prosecutor's remarks.

Therefore, we conclude that any alleged error was waived.

IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

Harkcom argues that he received ineffective assistance of counsel because his attorney "failed to move to suppress [English's body camera footage] containing his statements to [the] police." Br. of Appellant at 44. The State argues that Harkcom "waived his objection to the admissibility of his statement in full." Br. of Resp't at 54. The State also argues that defense counsel's decision to admit the video was a strategic decision. We agree with the State and conclude that Harkcom's ineffective assistance of counsel claim fails.

Criminal defendants have a right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22.

To prove ineffective assistance of counsel, a defendant must show (1) counsel's representation was so deficient it fell "below an objective standard of reasonableness" and (2) that deficiency prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (quoting and applying test from *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Failure to satisfy either requirement defeats the claim. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024).

24

To show ineffective assistance of counsel for failure to object, "a defendant must [first] show that an objection would likely have been sustained." *State v. Fortun-Cebada*, 158 Wn. App. 158, 172, 241 P.3d 800 (2010). "The defendant must overcome 'a strong presumption that counsel's performance was reasonable.'" *Bertrand*, 3 Wn.3d at 130 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all circumstances." *State v. Stotts*, 26 Wn. App. 2d 154, 165, 527 P.3d 842 (2023).

Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *Kyllo*, 166 Wn.2d at 863. A "defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). When "inadmissible evidence is significant to the State's case, either in quantity or quality, there is generally no legitimate reason for failing to object." *Stotts*, 26 Wn. App. 2d at 166; *State v. Vazquez*, 198 Wn.2d 239, 248-49, 494 P.3d 424 (2021).

Second, prejudice requires showing that, but for counsel's deficient performance, "there is a reasonable probability . . . the result of the proceeding would have differed." *State v. Estes*, 193 Wn. App. 479, 488, 372 P.3d 163 (2016). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012) (quoting *Strickland*, 466 U.S. at 694).

Harkcom's ineffective assistance of counsel claim fails because the record clearly supports that his attorney's decision to admit the entirety of the footage was a strategic decision he made after consultation with and agreement from Harkcom. At the hearing considering Harkcom's motion in limine regarding the footage, Harkcom's attorney explained that he was no longer

pursuing the motion to avoid redacting the footage. Harkcom was advised of his right to exclude portions of the video but determined that, after consulting with his attorney, he "prefer[red] the entire context" of the footage. RP (May 29, 2024) at 48. As our Supreme Court has explained, a strategic decision cannot form the basis of an ineffective assistance of counsel claim. *Kyllo*, 166 Wn.2d at 863.

Harkcom goes on to argue that "[c]ounsel's motion to suppress two specific portions of the video indicate he did not believe he had a basis to suppress the entire thing." Reply Br. of 24. To that end, Harkcom claims that defense counsel should have suppressed the entirety of the video based on a *Miranda* violation. The record does not support this assertion. Harkcom's attorney acknowledged that the footage "implicate[d] some of Mr. Harkcom's constitutional rights," meaning he was aware of more rights than the one he specifically discussed at the hearing. RP (May 29, 2024) at 47. And Harkcom's attorney also explained that he "discussed [the issue] at length" with Harkcom.[19] RP (May 29, 2024) at 48.

Nevertheless, even if we were to conclude that defense counsel's performance was deficient, Harkcom's claim would still fail because he cannot prove he was prejudiced. Harkcom claims that "[s]howing the jury footage of [him] lying about where he was the night before surely impacted the jury's impression of him." Reply Br. at 29. But the body camera footage was nonessential in light of the other evidence and testimony admitted at trial. *Contra Stotts*, 26 Wn.

---

[19] Courts have previously concluded that strategic decisions to waive the potential exercise of a constitutional right cannot form the basis of an ineffective assistance of counsel claim. *See State v. Ashue*, 145 Wn. App. 492, 505-06, 188 P.3d 522 (2008) (holding that a defendant's waiver of their right to a jury trial at the recommendation of defense counsel did not amount to ineffective assistance of counsel because it was a strategic decision); *State v. Young*, 196 Wn. App. 214, 217, 222, 382 P.3d 716 (2016) (holding that defense counsel's stipulation to the admission of a videotaped interview where the defendant confessed to the crime was not ineffective assistance of counsel because it was a strategic decision).

App. 2d at 173-74. The evidence and testimony presented at trial overwhelmingly supports Harkcom's guilt. For example, several witnesses testified that Harkcom was out at the bars on the evening of April 11 and the early morning of April 12. And footage outside of Four Corners showed Harkcom's vehicle driving south on Bald Hills Road mere minutes before the accident was reported. Furthermore, Harkcom's blood was found on the driver's airbag, and Kohlman's testimony supported Harkcom swerved into the northbound lane and hit Santiago.

Therefore, we conclude that Harkcom's ineffective assistance of counsel claim fails.

CONCLUSION

Accordingly, we affirm Harkcom's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, C.J.

We concur:

_____
Glasgow J.

_____
Che, J.